IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 1, 2015

**RIVERA L. PEOPLES v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2010-B-1177      Cheryl A. Blackburn, Judge**

**No. M2014-02139-CCA-R3-PC – Filed January 6, 2017**

The Petitioner, Rivera L. Peoples, filed in the Davidson County Criminal Court a petition for post-conviction relief from his conviction of first degree murder, alleging that his trial counsel was ineffective. The Petitioner also filed a petition for a writ of error coram nobis, alleging that newly discovered evidence in the form of recanted testimony entitled him to relief. The trial court denied both petitions. On appeal, the Petitioner challenges the rulings of the trial court. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Harry A. Christensen, Lebanon, Tennessee, for the Appellant, Rivera L. Peoples.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn Funk, District Attorney General; and Bret Gunn and Megan King, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**
**I. Factual Background**

After a trial on August 9-11, 2010, the Petitioner was convicted by a Davidson County Criminal Court Jury of first degree felony murder, and he received a life sentence. On direct appeal, this court summarized the proof adduced at trial as follows:

The evidence at trial established that Linburg Thompson ("Victim Thompson"), a fifty-three-year-old father of four, was killed on the night of December 10, 2008, while working at Ace's Market in Nashville. Gift Wilford Bonwe, another individual working at Ace's Market that evening, testified that Victim Thompson had taken out the trash, and, while Victim Thompson was outside, Bonwe heard loud noises that sounded like the slamming of the dumpster lid. As Bonwe walked toward the door, a lady rushed inside and told him that there had been a shooting outside. Bonwe then called the police. Shortly thereafter, a neighbor ran into the store and told Bonwe that Victim Thompson had been shot. Bonwe ran outside and found Victim Thompson on the ground "gasping for his life." Unbeknownst to Bonwe, the lady who reported the shooting had also been shot, and when Bonwe returned into the store, he found her crawling on the floor and asking for help.

. . . .

Antoinette Bell ("Victim Bell") testified that she was shot at Ace's Market on December 10, 2008. She lived within walking distance of the store, and she was at the market that night buying beer and cigarettes. Standing outside, she observed a silver car across the street and noticed two men get out of the car and walk toward the store. As one of the men walked into the store, Victim Bell asked him for a lighter. He told her that he did not have one, but as he later walked back out of the store, he handed her a lighter. At approximately the same time that the man with the lighter exited the store, Victim Thompson walked out of the store with garbage. Once Victim Thompson walked around the corner toward the dumpster, Victim Bell heard someone say, "go get the money out of the register." She then heard Victim Thompson respond, "I'm not going to get s**t, you go get it yourself." Immediately thereafter, she heard shots fired near the dumpster, and she ran into the store. About a minute or so after running into the store, Victim Bell became dizzy and realized that she herself had been shot. On cross-examination, Victim Bell stated that she did not notice how many people were in the silver automobile. She did not see

the face of any other individuals involved in the shooting except for the person from whom she asked for the lighter.

Trey Mosby testified that in December of 2008, he lived within close proximity to Ace's Market. On the night of December 10, 2008, he was at home and observed a silver Chevrolet Impala parked in front of his house. He noticed that there were four black males sitting in the vehicle. Two of the men in the vehicle stepped out and walked toward the store. He noticed that the vehicle's rims were not typical hubcaps but were alloy wheels with emblems. Mosby did not witness the shooting because he and his roommate left their residence right after he observed the men getting out of the vehicle.

Brian Beech testified that he lived directly across the alley from Ace's Market on December 10, 2008. At the time of the shooting, Beech was asleep at home, but he awoke to the sound of four gunshots. He jumped out of bed and ran toward the back of the house to look out the window, at which point he observed a silver Chevrolet Impala driving up the alleyway. The Impala stopped long enough for an individual to enter the back passenger seat and then continued driving up the alleyway. Beech noticed that the vehicle had a "drive-out tag," "some factory rims or some polished rims," and a "spoiler." After the car drove away, Beech walked outside and noticed that Victim Thompson was on the ground. Later, the police escorted Beech to view a vehicle which he identified as the vehicle he had seen in the alley.

Beverly Landstreet testified that on December 10, 2008, she lived next to the alley near Ace's Market. That evening, she heard some gunshots, and when she looked outside, she observed a silver Impala driving slowly up the alleyway. She called the police and spoke with officers once they arrived at the scene. Later, an officer escorted her and her roommate to a location where they identified a vehicle as the one they saw driving in the alley.

. . . .

Lieutenant Matt Pylkas, Metro Police Department ("MPD"), testified that he was working on the night of December 10, 2008. When he received the call about the shooting, Lieutenant Pylkas assisted in searching for the suspects instead of going to the scene of the incident. He received a description that the vehicle was "a silver Impala with a temporary tag" and "an air foiler [sic] on the back." Shortly after reaching the Edgehill area, he observed a vehicle parked alone that matched the description received over the radio. Lieutenant Pylkas exited his vehicle to peer inside the Impala. He observed a stocking cap and some bandanas in the interior of the vehicle, and he placed his hand in front of the engine area and noticed that it was "extremely hot," indicating that the vehicle had been driven recently.

Officer George Bowton, a crime scene investigator for the MPD, testified that on the night of December 10, 2008, he responded to a call regarding a shooting at Ace's Market. As part of his responsibility at the scene, he drew a diagram depicting the scene of the shooting and the location of evidence obtained. Additionally, he collected one bullet and two shell casings as evidence. He identified the two shell casings as Winchester nine millimeter Luger cartridge casings.

Lynette Mace, MPD Crime Scene Investigations, testified that her involvement with the case included investigating the 1999 Chevrolet Impala identified by witnesses as the car used in the commission of the shooting. Her investigation included photographing the vehicle and articles located inside and obtaining those items to submit for analysis of deoxyribonucleic acid ("DNA"), gunshot residue, and fingerprints.

The State read into evidence the depositions of Officer Thomas E. Simpkins, MPD, and Officer Belinda Shea, MPD. Officer Simpkins stated in his deposition that he found fingerprints on approximately seven compact discs that he submitted for fingerprint analysis. In Officer Shea's deposition, she testified as an expert in latent fingerprint identification. She analyzed latent fingerprints submitted in this case by Officer Simpkins and Officer Mace. From the

compact discs submitted, she found prints matching those of the [Petitioner] and an individual named Brian Moreland. From the prints lifted from an amplifier located in the trunk, Officer Shea matched a finger print to that of the [Petitioner]. Finally, on a box of dryer sheets, she identified prints as matching those of an individual named James Dowell. Officer Shea acknowledged that she analyzed several prints that she could not match conclusively to certain individuals. She also agreed that she could not discern the age of a fingerprint from her analysis.

Brian Moreland testified that he was involved in an attempted robbery at Ace's Market on December 10, 2008. He stated that the other individuals involved in the attempted robbery were the [Petitioner], Dowell, and Harris. He had known these other men for approximately a few months prior to the incident, and he identified the [Petitioner] and Harris as brothers. On the night of the shooting, the four men determined that they needed some money, so they decided to drive around the area until they found a place to rob. Moreland confirmed that they were riding in the [Petitioner's] car and that the [Petitioner] was driving. They took with them gloves, hats, bandanas, and two guns, and they eventually decided to rob Ace's Market.

Moreland further testified that upon reaching the store, Dowell exited the vehicle and walked toward the store. At some point, Dowell entered the store, and the [Petitioner] listened by cell phone from the car. When Dowell left the store, the [Petitioner] drove the car up to the side of Ace's Market to retrieve Dowell. As Dowell was about to get into the car, Harris jumped out of the car. Harris confronted a man standing outside, "and when the dude swung at [Harris], [Harris] shot" the man twice. Immediately thereafter, Harris approached the front of the store, and, although Moreland could not see Harris at this point, Moreland heard another gunshot. Harris returned to the vehicle, and the four men drove away to the Edgehill Housing Development, where Harris's girlfriend lived and where Harris was staying at the time.

Moreland stayed at Harris's girlfriend's residence for a few hours, and at some point, the four men saw police surrounding the [Petitioner's] vehicle from the window. The police eventually knocked on the door, but no one answered the door. Moreland acknowledged that he had been charged with the same crime as the [Petitioner], and, although he had not been promised anything for his testimony, he hoped that his testimony would be beneficial to the resolution of his case.

On cross-examination, Moreland agreed that he never intended for anyone to get shot or hurt. He also acknowledged that, when Harris jumped out of the vehicle, Harris was acting on his own accord and Moreland did not know what Harris was doing. However, on redirect examination, Moreland admitted that all of the men were planning to get out of the car but that Harris simply jumped out of the car sooner than Moreland anticipated.

Detective Jill Weaver, MPD, testified that she interviewed approximately fifteen individuals throughout the investigation of this case, including all four individuals allegedly involved in the attempted robbery. The State played a video that consisted of Detective Weaver interviewing the [Petitioner]. In the video, the [Petitioner] explained that on the night of the shooting he went to the mall with his brother in the [Petitioner's] vehicle. When they returned from the mall, he left his vehicle at his residence, and his daughter's mother picked him up and drove him to Fairview for the evening. The [Petitioner] also referred to his association in the "GD's," which Detective Weaver explained was a reference to a gang called the Gangster Disciples.

Jerome Bonsu testified that he owns an automobile dealership on Dickerson Pike. He identified a bill of sale from his company bearing the name of the [Petitioner] as the purchaser of a gray Chevrolet Impala on November 24, 2008. Bonsu confirmed that he sold the vehicle to the [Petitioner]. He also identified a reference sheet included with the [Petitioner's] file that listed phone numbers for Antonio Harris, Brian Moreland, James Dowell, and Sham[e]ka Harris

[Malone[1]].  On the bill of sale, the [Petitioner] also provided his cell phone number.

Agent Richard Littlehale, Tennessee Bureau of Investigation ("TBI"), testified as a communications analyst in crime investigations.  He received phone records for the cell phone numbers of the [Petitioner], Moreland, Dowell, and Harris, which were admitted as evidence at trial.  Each cell phone record included a reference to the cell tower used to transmit each call.  He then calculated the distance from that tower to pertinent locations in the case.  He explained that in an urban area, cell towers were approximately one or two miles apart.  Calls customarily are transmitted from the cell tower that is closest to the location of the cell phone.  From his calculation, a call made by the [Petitioner] at the approximate time of the shooting was transmitted from a tower point six four three (0.643) miles from the scene of the shooting.

Dr. Thomas Deering, a medical examiner and forensic pathologist with Forensic Medical Management Services, testified that he performed an autopsy on Victim Thompson. . . .  Dr. Deering concluded that Victim Thompson died as a result of multiple gunshot wounds to the abdomen.

Cassaundra Waters testified that in December of 2008, she had been dating the [Petitioner] for about a month.  She worked with Lisa Anderson, the girlfriend of Harris, and because Waters was separated from her husband at the time, she also lived with Anderson.  According to Waters, on the evening of December 10, 2008, the [Petitioner] left with Harris to go to the mall.  After they returned to Anderson's residence, police came to the door, but no one answered the door.  Waters could not recall whether the [Petitioner] spent the night at Anderson's residence that night.  The next day, Waters and the [Petitioner] observed a news story on television regarding the shooting at Ace's Market.  The Defendant told Waters that the [Petitioner], Harris, Dowell,

---

[1] At the post-conviction hearing, this individual testified that her name was Shameka Harris Malone.  Additionally, she said that the Petitioner and Harris were her brothers.

and Moreland went to the store that evening with the purpose of robbing it.

Jamesia Dowell, sister of Dowell, testified that she has had a relationship with the [Petitioner] and that they had two children together. In December of 2008, she lived in Fairview. Early one morning, the [Petitioner] woke Jamesia by calling her to request that she say that he was in Fairview if anyone asked her about his whereabouts on the night of December 10, 2008. She acknowledged that he was not, in fact, in Fairview on that date.

. . . .

Agent James Russell Davis, II, TBI, testified as an expert in the field of microanalysis. He explained that when a weapon is fired, gunpowder settles on all the objects in close proximity to the weapon. He tested gloves found throughout the [Petitioner's] Impala including: one glove from the trunk, two pairs from the rear seat area, and a pair located in the glove box. From his analysis, Agent Davis discovered that there was gunshot residue on all the gloves tested.

Agent Michael Turbeville, TBI, testified as an expert in the field of DNA analysis. He tested a number of items in an attempt to discover DNA profiles on the items. On a pair of black gloves recovered from the rear passenger area of the [Petitioner's] Impala was a mixture of DNA matching Harris, Dowell, the [Petitioner], and a female. He also matched the DNA found on a black bandana in the glove box to Harris. Regarding the pair of gloves found in the glove box, one glove had DNA consistent with that of Harris and Dowell, with the possibility of Moreland and a female as additional contributors. The corresponding glove contained DNA matching that of Harris and Dowell, with the possibility of the [Petitioner] and a female as additional contributors. A black bandana from the rear passenger area of the vehicle matched the DNA of Harris and Dowell. Based on the analysis of an additional pair of gloves retrieved from the rear passenger area of the vehicle, Agent Turbeville discovered DNA on one glove consistent with that of Harris, Dowell, and Moreland, with the possibility of a match to the [Petitioner] and a

female. With regard to the corresponding glove, he discovered DNA consistent with that of the [Petitioner], Dowell, and Moreland, with the possibility of Harris and a female as additional contributors. From a bandana found in a pocket in the back passenger seat, Agent Turbeville discovered DNA matching that of the [Petitioner] and Moreland. Another bandana found in that pocket contained DNA consistent with that of Dowell. Agent Turbeville opined that tennis shoes found in the car matched the [Petitioner's] DNA as well as a female's DNA. A white shirt retrieved from the rear floorboard contained DNA consistent with that of the [Petitioner] and a female. Additionally, Agent Turbeville obtained nasal secretion from the shirt that matched the [Petitioner's] DNA.

. . . The [Petitioner] took the stand and testified that on the evening of December 10, 2008, he drove to the mall with his brother, Harris, and Dowell to buy shoes for his daughter. The State asked the [Petitioner] why he did not mention to the police that Dowell went with him to the mall. He responded, "I guess, when you tell one lie, you've just got to continue. You have to build on that lie. So when you tell one lie, you've got to continue to tell another lie to cover that first one up." After returning from the mall to the Edgehill area, Harris asked to borrow the [Petitioner's] car. According to the [Petitioner], Harris, Dowell, and Moreland then left for approximately fifteen to twenty minutes. When they returned, Harris told the [Petitioner] that someone had been shot.

State v. Rivera L. Peoples, No. M2010-02162-CCA-R3-CD, peop, at *1-6 (Tenn. Crim. App. at Nashville, June 20, 2012) (footnotes omitted).

Thereafter, the Petitioner filed a petition for post-conviction relief, listing the following instances of ineffective assistance of counsel:

1. The failure of [trial counsel] to investigate, subpoena, and secure the attendance at trial [of] Shameka D. Harris [Malone] as an alibi witness for [the Petitioner].

2. The failure of [trial counsel] to investigate, subpoena and secure the attendance, at trial, of the custodian of the cellular

- 9 -

phone records for the number (615) 589-0741 to authenticate [the Petitioner's] cell phone records and calls during time periods and location in relation to the crime.

3. The failure of [trial counsel] to investigate, subpoena and secure the attendance, at trial, of co-defendant, James Dowell, as an exonerating witness for [the Petitioner].

4. The failure of [trial counsel] to investigate, subpoena and secure the attendance, at trial, of Joshua Ostein, as an exonerating witness for [the Petitioner].

5. The failure of [trial counsel] to object, at trial, to the playing of Detective Weaver's entire interview of Cassaundra Waters.

6. The failure of [trial counsel] to request jury instructions concerning what the trial court determined to be prior inconsistent statements of Cassaundra Waters.

7. [Trial counsel] provided ineffective assistance of counsel by failing to consult with [the Petitioner] regarding the overarching defense strategy which involved [trial counsel's] unilateral decision to concede [the Petitioner's] guilt in front of the jury.

8. Subsequent to [the Petitioner's] conviction, [trial counsel] received charges via the Board of Professional Responsibility regarding three prior clients for mishandling their cases and not proceeding in a timely fashion, resulting in a suspension of his law license. In addition, on May 20, 2013, [the Petitioner] received authorization from the Board of Professional Responsibility to file formal charges against [trial counsel] for his failure to handle [the Petitioner's] case in a professional and effective manner, (including never visiting [the Petitioner] to discuss his case while incarcerated pending trial). . . .

The Petitioner also filed a petition for a writ of error coram nobis, alleging that Moreland had recanted his trial testimony and exculpated the Petitioner from any involvement in the murder. The trial court first held a hearing regarding the post-conviction claims. Immediately thereafter, the court conducted a hearing regarding

- 10 -

whether the petition for a writ of error coram nobis was time-barred or whether due process required tolling of the statute of limitations.

At the post-conviction hearing, trial counsel testified that he discussed the charges[2] with the Petitioner each time they went to court. Trial counsel did not recall meeting with the Petitioner at the jail. During the meetings, trial counsel tried to explain the defense strategy. Initially, trial counsel intended to pursue an alibi defense based upon the Petitioner's spending the night at Malone's house. However, "once all the proof had come out," trial counsel determined that the best strategy was to argue the Petitioner had abandoned the crime.

Trial counsel said that he and the Petitioner discussed potential witnesses and that the Petitioner told him Malone was an alibi witness. However, when trial counsel tried to contact Malone, he did not get an answer or did not "like the feel of what [he] heard." Therefore, trial counsel never filed a notice that he intended to use an alibi witness. Trial counsel said that not much evidence existed to support an alibi defense. Regarding alibi, trial counsel said, "It's fair to say someone might have – there might be someone out there who could have said something." Nevertheless, trial counsel asserted, "If there was an alibi possibility, I would have followed up with it." Trial counsel maintained that the defense was designed to counter the State's evidence and that he did not want to present a defense that was not credible.

Trial counsel said that he learned from discovery that the State planned to introduce cellular telephone records and that he discussed the records with the Petitioner. The Petitioner told trial counsel that the telephone involved was not his; however, the Petitioner had used that telephone number on the application to buy the car that was used in the crimes.

Trial counsel said that he did not speak with the Petitioner's co-defendants but that he did speak with their attorneys. The Petitioner told trial counsel that co-defendant Dowell had written a letter stating his intention to recant his statement to the police that implicated the Petitioner; however, Dowell's attorney told trial counsel that Dowell would not recant his statement. Trial counsel said that he did not call Dowell as a witness at trial because the police had video recorded an interview with Dowell shortly after the crimes, and his testimony could have been impeached with the video.

Trial counsel said that he thought co-defendant Moreland would testify for the State against the Petitioner. Trial counsel could not recall whether he researched Moreland's criminal history to determine if any of the offenses could be used for

---

[2] The Petitioner was originally charged with felony murder, attempted second degree murder, and employing a firearm during a dangerous felony but ultimately was tried on only the felony murder charge.

impeachment, but trial counsel said that he normally performed such research. Trial counsel acknowledged that through discovery, he learned Joshua Ostein gave a statement to detectives regarding "[s]omething he overheard" concerning the murder. Trial counsel did not interview Ostein. Trial counsel said that Ostein's statement would not have rebutted Moreland's testimony. Trial counsel did not know whether Moreland, Dowell, Harris, or Malone had signed affidavits.

Trial counsel conceded that the Board of Professional Responsibility (BPR) had received complaints about his failure in civil cases to prepare for trial, stay in touch with clients, perform due diligence, and other claims of misconduct. Counsel further conceded that in January 2012, his license to practice law was suspended for two years. Additionally, the Petitioner had filed a complaint with the BPR, which trial counsel was disputing "very aggressively." Trial counsel asserted that he did a "professional job" representing the Petitioner; he noted, however, that "[c]ommunication was breaking down towards the end."

On cross-examination, trial counsel said he thoroughly examined the State's proof against the Petitioner, and he informed the Petitioner the State's case was strong. The Petitioner told trial counsel at least three or four different versions of the events on the night of the offenses. During counsel's discussions with the Petitioner, "the details would evolve." Trial counsel became uncomfortable with presenting any of the Petitioner's versions of events at trial. He felt "boxed in" because he feared the Petitioner would commit perjury and advised the Petitioner against testifying. Nevertheless, the Petitioner insisted on testifying.

Trial counsel asked the Petitioner to introduce himself and to tell what happened but did not ask further questions because he did not want to suborn perjury. Trial counsel stated that the Petitioner's testimony was not corroborated by any other proof. Trial counsel "thought it would be presumptuous to think the jury would be that gullible for me to argue that fact pattern or that narrative" to which the Petitioner testified. Before trial, trial counsel had never heard the version of events to which the Petitioner testified. When faced with the Petitioner's testimony, which contradicted the Petitioner's previous versions of events, trial counsel concluded that presenting a defense of abandonment was the Petitioner's best chance to receive a lesser offense, an acquittal, or a hung jury. Trial counsel noted that one of the co-defendants had advanced an abandonment defense and obtained a mistrial due to a hung jury.

Trial counsel acknowledged that he knew about Dowell's letter recanting his statement to the police. Trial counsel said that even if Dowell had testified consistently with the recantation, the State would have introduced the video recorded interview of Dowell as a prior inconsistent statement. In the interview, Dowell stated that the defendants were in the Petitioner's car, the Petitioner was driving, and the Petitioner "was

part of the robbery plan." Trial counsel opined that the timing of the interview made it more credible than Dowell's potential trial testimony.

Trial counsel said the undisputed proof at trial was that Harris had shot the clerk. Trial counsel thought that the Petitioner first mentioned four to six months after the crime that he had a cellular telephone other than the one the police investigated. Trial counsel thought that telephone companies typically did not keep records for longer than six months. The Petitioner never explained why he gave the number of the cellular telephone found in the car on his application when he bought the car instead of the other cellular telephone. Trial counsel said that he was well-prepared for trial and that even with hindsight, he would not have made different choices.

On redirect examination, trial counsel said that he did not find the Petitioner's claims regarding alibi evidence to be credible, explaining:

> [W]e had two witnesses that said he asked them to lie about him being in Fairview [at Malone's house], we had his car, we had the phone number he provided on the application used in the robbery bouncing off the same towers as the other three numbers, the other three codefendants, and we had a codefendant testify.

On recross-examination, trial counsel acknowledged that the Petitioner had filed several complaints against him with the BPR. In his complaints, the Petitioner made allegations similar to those he made in his post-conviction petition.

James Dowell, a co-defendant, testified that the Petitioner had fathered children with Dowell's sister and that he had known the Petitioner since 2005 or 2006. Dowell identified a letter he wrote to trial counsel in 2009 or 2010, before the Petitioner's trial, in which he exculpated the Petitioner. The letter was admitted as an exhibit to the hearing.

Dowell testified that the Petitioner was not at Ace's Market on the night of the offenses. Dowell said that he, Moreland, and Harris went to Malone's house where the Petitioner was and borrowed the Petitioner's car. Harris drove them to Ace's Market. One of the men talked on a cellular telephone during the drive, but Dowell could not remember which man used the telephone.

On cross-examination, Dowell acknowledged that after his arrest, he told the police that the Petitioner "was involved and was part of the plan to rob the Ace Market." After being indicted, Dowell spoke with a prosecutor and reiterated the Petitioner's involvement in the crimes. He provided details in the hope that he could testify for the State. Sometime before the Petitioner's trial, Dowell and the Petitioner were transported

together for a court date in Williamson County. Thereafter, Dowell wrote the recantation letter. Because of the letter, the prosecutor told Dowell's attorney that Dowell had breached the "deal" with the State, that he would not be used as a witness at the Petitioner's trial, and that he would be prosecuted for the offenses.

Dowell denied telling his attorney that he was forced to write the recantation letter and that its contents were not true. Dowell stated that after he wrote the letter, he no longer wanted to testify against the Petitioner. Nevertheless, after he wrote the letter, his attorney filed a motion contending that Dowell was willing to abide by the deal with the State and should not be prosecuted. Dowell asserted that he did not know why a hearing was held on the motion or why his attorney appealed the issue to the Tennessee Supreme Court.[3] He said that if he had been called to testify at the Petitioner's trial, he would have testified about his own involvement in the crime and "to this letter, that I wrote the letter."

On redirect examination, Dowell said that the State had offered a deal he could not refuse. In return for his testimony, his charges would be dismissed, and he would be released from jail. Dowell asserted that he "made up a lot of stuff just to get that deal." Dowell said that the Petitioner did not force him to write the recantation letter and that he did not discuss the letter with the Petitioner before he wrote it and sent it to trial counsel. Dowell said that he implicated the Petitioner because he had a "vendetta" against the Petitioner at the time. Once Dowell realized the seriousness of the offenses, he felt compelled to exonerate the Petitioner.

Shameka Harris Malone, the Petitioner and Harris's sister, testified that on the night of December 10, 2008, the Petitioner was at her house "[a]ll night," wrapping Christmas presents. She acknowledged that her house was a "couple of blocks" from Ace's Market but asserted that it "wasn't walking distance."

On cross-examination, Malone said that around 9:00 p.m., the Petitioner called her house and asked for her help wrapping Christmas presents. He arrived at her house around 9:15 or 9:30 p.m. and stayed until morning. She and the Petitioner were alone in the house. She was "sure" that the Petitioner talked to Harris "and them" by telephone "[n]ot long" after the Petitioner arrived at the house. Malone said that "the others" did not "come back" to her house that night.

---

[3] See State v. James L. Dowell, No. M2012-00520-CCA-R3-CD, 2013 WL 1804191, at *25-26 (Tenn. Crim. App. at Nashville, Apr. 30, 2013) (concerning an unrelated aggravated robbery and especially aggravated kidnapping case with Dowell and the Petitioner as co-defendants in which Dowell challenged the State's failure to honor an immunity cooperation agreement); perm. to appeal denied, (Tenn. Oct. 16, 2013).

Malone said that a detective came to her house but did not ask her questions. Trial counsel never spoke with her, and she never told him that the Petitioner was with her at the time of the offense.

Brittany Bates testified that she talked to the Petitioner on a nearly daily basis during the four months the Petitioner was in custody awaiting trial. During almost every conversation, the Petitioner asked for her assistance in contacting trial counsel. Bates tried to deliver "papers" to trial counsel's office, but he either was not there when she went by the office or canceled their appointments. She alleged that trial counsel's secretary was in the office on only one occasion when she tried to make a delivery.

Josh Ostein testified that "[a]t some point," he overheard Moreland say

> that he was trying to serve somebody [at Ace's Market] and they tried to take the dope from him. So when they tried to take the dope, [Moreland] pulled out a gun and started shooting. And one of the victims that was in the way lost his life in the process of it.

Ostein said that Moreland did not mention the Petitioner when describing the incident. Ostein said that he was never asked to testify to counter Moreland's testimony.

On cross-examination, Ostein said that he was subpoenaed to testify at Dowell's trial. During a jury-out hearing, Ostein invoked his Fifth Amendment right to remain silent but was told that because he was not a defendant, he had no Fifth Amendment privilege in relation to that case. Nevertheless, Ostein asserted that he did not want to get involved, and "they let [him] go." Ostein said that at the time of Dowell's trial, he was scared that he "might end up getting involved in this."

Ostein said that when he was booked into jail on unrelated robbery charges, Detective Weaver asked him about Moreland. Ostein opined that Detective Weaver thought he knew something about the Ace's Market shooting because he was from the same area as Moreland. Ostein said that he was arrested a couple of months after the Ace's Market shooting.

Upon questioning by the post-conviction court, Ostein said that he did not recall testifying during a jury-out hearing at Dowell's trial that he did not know Moreland.

The Petitioner testified that trial counsel did not visit him in jail. He also testified that he never spoke with trial counsel about his case. He tried calling or writing, but trial counsel never responded. While in jail, the Petitioner asked Bates to try to contact trial counsel, but she was unsuccessful.

- 15 -

The Petitioner testified that he told trial counsel "through correspondence" that the telephone records used by the State to place the Petitioner at the scene of the crime were from a "prepaid phone that was used by several people"; it was not the cellular telephone registered in his name. Trial counsel told the Petitioner that pursuing the records relating to the telephone registered to the Petitioner was "a wild goose chase."

The Petitioner said that the night of the offense, he and his brother, Harris, were at Hickory Hollow Mall. After the Petitioner left the mall, he went to Malone's house to wrap Christmas presents. The Petitioner spent the rest of the night at Malone's house and let Harris borrow his car.

The Petitioner said that his car was impounded after the crime. The Petitioner said when he spoke to detectives about the car, he tried to protect people and denied that the car was his or that his brother was involved. He asserted that he did not know the lies he told to protect people would result in his being convicted of murder.

The Petitioner asserted that he wanted his defense to be that he was not at the scene of the crime. He never told trial counsel that he was present at the scene but abandoned his involvement in the crimes. He thought trial counsel's arguing abandonment essentially conceded the Petitioner's guilt in the crimes. The Petitioner said trial counsel presented the abandonment defense without first consulting him.

The Petitioner asserted that he and trial counsel did not communicate before trial. Trial counsel sent "a paralegal or an assistant" and an investigator to meet with the Petitioner, but they would not answer the Petitioner's questions. The Petitioner had never heard about criminal responsibility before the first day of trial. The Petitioner said that he was never advised of the charges against him or of the potential life sentence.

On cross-examination, the Petitioner said that trial counsel never informed him of any plea offers made by the State.

The State recalled trial counsel, who testified that he conveyed the State's plea offer to the Petitioner and discussed the offer with him. Trial counsel said that "it was a forty-year offer, dismiss everything else." Trial counsel said that he explained felony murder and criminal responsibility to the Petitioner.

Upon questioning by the post-conviction court, trial counsel acknowledged that the Petitioner testified that he was not present at the scene of the crime and was instead at his sister's house. He contended that he did not know what the Petitioner's trial testimony would be. Trial counsel said that he argued abandonment based on the evidence presented at trial, explaining that he thought the jury would not believe the

- 16 -

Petitioner's testimony. Trial counsel focused on the State's burden of proof during the opening statement and on abandonment during closing argument. Trial counsel acknowledged that he hired a private investigator and that he had a "[s]ecretary slash paralegal." Trial counsel asserted that his paralegal "at that time was in the office all the time except for an hour for lunch."

Dowell's attorney, C.W., testified that Dowell's agreement with the State was "that if he testified truthfully and was honest from that point forward that he would receive substantial mercy in . . . the murder case." The agreement further provided that the charges against him on "the home invasion cases" would be "dismissed or retired." C.W. recalled that Moreland had agreed to testify against Dowell. C.W. said that the State never promised that Dowell would be released "[a]t any particular time."

C.W. agreed that Dowell's "position . . . changed" after he wrote the recantation letter. C.W. filed a motion to compel the State to enforce the deal regardless of Dowell's recantation letter. At a hearing on the motion, C.W. informed the court that Dowell had told the truth in his statement to the police and that Dowell was willing to testify consistently with the statement. C.W. appealed the State's failure to honor the deal, but relief was denied. C.W. thought he called Ostein to testify at Dowell's trial in order to rebut Moreland's testimony that Harris was the shooter. However, Ostein refused to testify.

Teresa Michelle Hamblen, a correctional officer, testified that she recognized a document written and signed by Moreland. She first saw the document on March 6, 2013. She did not recall notarizing the document but acknowledged signing it. Hamblen said that her records reflected that the document was a letter, not an affidavit. On cross-examination, Hamblen said that she did not place Moreland under oath before he signed the document.

In support of the petition for a writ of error coram nobis, the Petitioner testified that Moreland wrote him letters apologizing for lying and implicating the Petitioner in the crimes. Moreland asked if he could do anything to help the Petitioner, and the Petitioner suggested that he "put it in writing." "[S]ometime right before" the Petitioner filed the petition for a writ of error coram nobis in May 2013, the Petitioner received an affidavit from Moreland, recanting his trial testimony. The Petitioner said that prior to trial, he did not know what Moreland's testimony would be.

The Petitioner said that his trial ended on August 11, 2010, and that his motion for new trial was denied thirty or forty-five days later. The Petitioner said that he was incarcerated and could not have obtained Moreland's recantation earlier.

On cross-examination, the Petitioner said that at the time of the hearing, he and Moreland were not housed at the same facility. They previously had been in the same prison but had not been allowed see each other because they were deemed "incompatible[]," and Moreland was in protective custody. The Petitioner said that he did not have any friends in prison take messages to Moreland. The Petitioner said that Moreland wrote three or four letters before writing the recantation.

E.H. testified that she represented Moreland in the Ace's Market murder case. She said that during the pendency of that case, she and Moreland met with the State regarding whether Moreland would testify for the State. The State never encouraged Moreland to lie. Moreland never told E.H. that the Petitioner was not involved with the murder; in fact, he said "quite the opposite." When asked if Moreland ever said the Petitioner was not involved, E.H. responded, "There was never any doubt who was involved."

E.H. said that she had been "in touch" with Moreland since the recantation document was filed. She knew that Moreland was placed in protective custody because of a concern that either the Petitioner or the Petitioner's "agents" would harm Moreland.

On cross-examination, E.H. denied that Moreland's testimony was "crucial" to the Petitioner's prosecution, noting that the State had "a very strong case" against the Petitioner without Moreland's testimony. She noted that Moreland "never wanted to testify." E.H. advised him that testifying for the State could benefit him but that they had no deal that guaranteed any benefit. She thought Moreland originally faced a fifty-six-year sentence but eventually received a ten-year sentence.

Upon questioning by the post-conviction court, E.H. said that Moreland testified two or three times against the Petitioner and Dowell.[4] Moreland's trial testimony was consistent with what he told E.H. E.H. said that at least one month prior to trial, trial counsel knew that Moreland intended to testify for the State against the Petitioner.

The assistant district attorney general who prosecuted the Petitioner testified that Moreland testified for the State at the Petitioner's trial. The prosecutor said that he never attempted to have Moreland testify untruthfully and that he never "coach[ed]" Moreland on how he should testify. The prosecutor told Moreland that if he testified against the

---

[4] The Petitioner and Dowell were tried separately for the murder committed at Ace's Market, and Moreland testified at each trial. See State v. James L. Dowell, III, No. M2011-02096-CCA-R3-CD, 2012 WL 3939978 (Tenn. Crim. App. at Nashville, Sept. 11, 2012); State v. Rivera L. Peoples, No. M2010-02162-CCA-R3-CD, 2012 WL 2356584 (Tenn. Crim. App. at Nashville, June 20, 2012). Additionally, Moreland testified at an unrelated case in which the Petitioner and Dowell were tried jointly for multiple counts of aggravated robbery and especially aggravated kidnapping. State v. James L. Dowell, No. M2012-00520-CCA-R3-CD, 2013 WL 1804191 (Tenn. Crim. App. at Nashville, Apr. 30, 2013).

Petitioner, he would "take all this into account in deciding how to resolve [Moreland's] case." Moreland never told the prosecutor that the Petitioner was not involved in the crimes.

The prosecutor stated that initially, the State planned to have Dowell testify against the Petitioner. However, before the Petitioner's trial, Dowell and the Petitioner were transported together to Williamson County for a case; afterward, Dowell recanted his statement implicating the Petitioner. Because Dowell was no longer a suitable witness, the prosecutor approached E.H. about Moreland's testifying for the State. Once it was determined Moreland would testify for the State, the prosecutor informed the Petitioner's trial counsel.

On cross-examination, the prosecutor opined that Moreland's testimony was not "critical" to the State's case against the Petitioner but that his testimony was "helpful." Regarding the Petitioner's role, Moreland consistently told the prosecutor that the Petitioner was at the scene and was involved in the crime. The prosecutor noted that even without Moreland's testimony, the State had ample evidence incriminating the Petitioner, including the car, the items in the car, and the cellular telephone records.

The prosecutor said that Moreland's affidavit stating the State encouraged him to lie was "upsetting" because Moreland "should have never been put in a position where he could have been influenced by either [the Petitioner] or people that were associated with [the Petitioner]." The prosecutor understood that Moreland had to "survive" in prison. The prosecutor said, "My opinion is he signed that affidavit so he could go to sleep that next night and not feel like somebody was going to hurt him and the next night and the next night until he got out of prison."

Upon questioning by the post-conviction court, the prosecutor said that he was careful when interviewing Moreland prior to trial because he did not want to suggest what Moreland should say. Moreland's statements and testimony were consistent with the other evidence the prosecutor had.

Brian Moreland was called to the stand. When asked about his affidavit recanting his testimony against the Petitioner, Moreland stated, "I don't want to testify." When asked to identify his signature on the document, Moreland responded, "I don't want to."

At the conclusion of the hearings, the trial court issued an order denying both the petition for post-conviction relief and the petition for a writ of error coram nobis. Regarding the post-conviction claims, the court found that the Petitioner failed to prove that his counsel was deficient or that the deficiency prejudiced the Petitioner. Regarding the petition for a writ of error coram nobis, the court found that the petition was not filed

timely and that due process did not require tolling of the statute of limitations. On appeal, the Petitioner challenges the rulings of the trial court.

## II. Analysis

### A. Post-Conviction

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in

- 20 -

any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the Petitioner contends:

1. Trial counsel's performance was deficient for his failure to hire an[] expert/forensics data examiner to rebut the State's expert's false testimony regarding the attachment of cell phone signals to cell towers, and how the police were able to locate the [Petitioner] at the time of the victim's death . . . .

2. Trial counsel was ineffective at the time of trial, as he was performing under pressure of disciplinary action and possible suspension from the practice of law, to the point that the [Petitioner] was denied the right to a fair trial, in violation of the Sixth Amendment of the United States Constitution and law.

3. [The Petitioner] was denied his fundamental right to dispense with the services of trial counsel, in direct violation of his right to a fair trial under the Sixth Amendment.

4. Trial counsel was ineffective for his failure to present an alibi defense that was available for his client at the time of trial.

5. Trial counsel committed the felony offense of Aggravated Perjury during the post-conviction proceedings, . . . and the [trial court] committed "plain error" in relying heavily on trial counsel's non-credible testimony when making its ruling on the Post-Conviction Petition.

6. Trial counsel was ineffective for failing to impeach State's witness, Brian Moreland, with [a] prior felony conviction during the rebuttal of his testimony.

7. Trial counsel was ineffective for conceding to an element of the crime and effectively denying [the Petitioner] the right to a fair trial, and the denial of due process of law and equal protection under the law.

- 21 -

Initially, we note that the State contends the Petitioner waived his issues regarding trial counsel's failure to hire a cellular telephone technology expert, trial counsel's representation being hampered by fear of pending disciplinary action, trial counsel's failure to impeach Moreland with a prior felony conviction, and the denial of the Petitioner's right to dispense with counsel. The State asserts that the Petitioner failed to raise the issues specifically in his post-conviction petition, present evidence regarding the issues at the post-conviction hearing, and argue the issues in the trial court. We agree. We will not address issues raised for the first time on appeal. State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996); State v. Turner, 919 S.W.2d 346, 356-57 (Tenn. Crim. App. 1995). Accordingly, we conclude that the Petitioner is not entitled to relief on these issues.

Regarding the Petitioner's claim that trial counsel was ineffective by utilizing the abandonment defense, the Petitioner testified that counsel did not discuss the defense with the Petitioner and that the defense essentially conceded an element of the offense. In a related issue, the Petitioner contends that trial counsel should have pursued an alibi defense by calling Ostein, Malone, and Dowell as potentially exculpatory witnesses.

The trial court found that trial counsel was credible but that the Petitioner was not credible. Trial counsel testified that although he did not meet with the Petitioner in jail, he met with the Petitioner each time they were in court. During the meetings, trial counsel reviewed the State's evidence with the Petitioner, and they discussed trial strategy. Additionally, trial counsel's investigator met with the Petitioner in jail. As the trial court noted, trial counsel did not investigate records relating to the Petitioner's other cellular telephone "because it would not disprove the State's evidence" regarding the cellular telephone found in the Petitioner's car. The trial court stated that "a difficult part of the case was that [the Petitioner's] version of events shifted," causing trial counsel to have "an ethical issue about [the Petitioner] taking the stand because he did not want to be a participant in suborning perjury." Nevertheless, the Petitioner exercised his constitutional right to testify and gave a version of events that was not believable. The trial court found that trial counsel "was hamstrung by [the Petitioner's] decision to perjure himself." The trial court stated that the Petitioner's complaints amounted to "attempting to blame [trial counsel] for [the Petitioner's refusal] to heed counsel's advice after testifying to a version of facts rejected by the jury."

The trial court further found "it incredulous" that the Petitioner's alleged alibi witness, Malone, "maintained silence that [the Petitioner] was at her house the entire evening until years after his conviction." Further, the court noted that Malone's account varied from the Petitioner's trial testimony. Notably, Malone testified at the post-conviction hearing that the Petitioner was at her house all night and that the co-defendants did not come by her house. At trial, the Petitioner asserted that he was at

Malone's house, that the co-defendants borrowed his car, and that they returned to Malone's house after the shooting.

The trial court accredited trial counsel's testimony that given the State's evidence against the Petitioner and the Petitioner's "perjured testimony," an alibi defense was not believable and was not the "best strategy."

The trial court acknowledged Dowell's testimony that his statement implicating the Petitioner was false. The trial court noted, however, that the Petitioner was the father of Dowell's sister's children and that Dowell had changed his story after being transported with the Petitioner to court in Williamson County. The trial court further found that Ostein's testimony that he heard Moreland confess to being the shooter was contradicted by other evidence, noting that it was undisputed Harris was the shooter. Moreover, Ostein was called as a witness in Dowell's trial and refused to testify. Therefore, trial counsel chose to pursue a defense of abandonment instead of alibi.

The trial court stated that the Petitioner did not tell trial counsel about his other cellular telephone until approximately seventeen months after the murder. The court accredited trial counsel's statement that telephone records likely would not exist after that length of time. Further, the court found that the other telephone would not disprove the State's claim that the telephone number the Petitioner gave on his car application was the number of the telephone used by the Petitioner during the crime. The court stated that the Petitioner "admitted at trial that he was using the phone and it is known that Mr. Dowell was on the phone, so any records would be irrelevant."

Based upon the foregoing, the trial court found that the Petitioner failed to prove either that trial counsel was deficient or that the Petitioner was prejudiced by any alleged deficiency. We conclude that even if counsel was deficient, the Petitioner has failed to prove any prejudice. This court has stated that, "[w]hen reviewing trial counsel's actions, this court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics." Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). Moreover, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). We conclude that the post-conviction court did not err by finding that the Petitioner failed to prove that his trial counsel was ineffective.

The Petitioner also claims that trial counsel committed aggravated perjury during the post-conviction hearing and that the trial court "committed 'plain error'" by relying on counsel's perjured testimony. The Petitioner asserts that trial counsel "repeatedly lied about everything from going to visit the [Petitioner] in jail, to discussing defense strategy, as later revealed th[r]ough the Complaint of the Board of Professional Responsibility."

We note that trial counsel acknowledged that he did not visit the Petitioner in jail. However, trial counsel also testified that he discussed defense strategy with the Petitioner. The trial court accredited the testimony of trial counsel. It is well established that "[i]n post-conviction claims, the credibility of the witnesses and the weight and value to be given their testimony is within the exclusive authority of the trial court." Timothy John Hickman v. State, No. 01C01-9711-CR-00527, 1998 WL 305505, at *1 (Tenn. Crim. App. at Nashville, June 11, 1998) (citing Taylor v. State, 875 S.W.2d 684, 686 (Tenn. Crim. App. 1993)). Therefore, this court may not re-weigh or re-evaluate the evidence, nor may we substitute our inferences for those drawn by the post-conviction court. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). Instead, we generally must defer to the post-conviction court's findings regarding "witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." Id. Again, we conclude that the Petitioner is not entitled to post-conviction relief.

## B. Writ of Error Coram Nobis

As his final claim, the Petitioner alleges that the trial court erred by ruling that due process did not require tolling of the statute of limitations for filing a petition for a writ of error coram nobis.

The writ of error coram nobis, which originated in common law five centuries ago, "allowed a trial court to reopen and correct its judgment upon discovery of a substantial factual error not appearing in the record which, if known at the time of judgment, would have prevented the judgment from being pronounced." State v. Mixon, 983 S.W.2d 661, 666-67 (Tenn. 1999). The writ, as first codified in Tennessee in 1858, was applicable to civil cases. Id. at 667-68. In 1955, a statutory version of the writ of error coram nobis was enacted, making the writ also applicable to criminal proceedings. Id. at 668. In general, the writ "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." Id. at 672.

Currently, the writ is codified in Tennessee Code Annotated section 40-26-105(b):

> The relief obtainable by this proceeding shall be confined to errors dehors the record and to matters that were not or could not have been litigated on the trial of the case, on a motion for a new trial, on appeal in the nature of a writ of error, on writ of error, or in a habeas corpus proceeding. Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly

- 24 -

discovered evidence relating to matters which were litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial.

Our supreme court outlined the procedure that a trial court considering a petition for a writ of error coram nobis is to follow:

[T]he trial judge must first consider the newly discovered evidence and be "reasonably well satisfied" with its veracity. If the defendant is "without fault" in the sense that the exercise of reasonable diligence would not have led to a timely discovery of the new information, the trial judge must then consider both the evidence at trial and that offered at the coram nobis proceeding in order to determine whether the new evidence *may have* led to a different result.

State v. Vasques, 221 S.W.3d 514, 527 (Tenn. 2007). In determining whether the new information may have led to a different result, the question before the court is "'whether a reasonable basis exists for concluding that had the evidence been presented at trial, the result of the proceedings might have been different.'" Id. (quoting State v. Roberto Vasques, No. M2004-00166-CCA-R3-CD, 2005 WL 2477530, at *13 (Tenn. Crim. App. at Nashville, Oct. 7, 2005)). Generally, a decision whether to grant a writ of error coram nobis rests within the sound discretion of the trial court. Id.

A writ of error coram nobis must be filed within one year after the judgment becomes final in the trial court. Tenn. Code Ann. § 27-7-103. "The statute of limitations is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." State v. Harris, 301 S.W.3d 141, 145 (Tenn. 2010). The trial court stated that the limitations period commenced in 2010, when the motion for new trial was denied. The petition for a writ of error coram nobis was filed in 2013, which clearly was well beyond the one-year statute of limitations. Nevertheless, the one-year statute of limitations may be tolled on due process grounds if a petition seeks relief based upon newly discovered evidence of actual innocence. Wilson v. State, 367 S.W.3d 229, 234 (Tenn. 2012).

Our supreme court has stated that "[i]n determining whether tolling of the statute is proper, the court is required to balance the petitioner's interest in having a hearing with the interest of the State in preventing a claim that is stale and groundless." Id. In general, "'before a state may terminate a claim for failure to comply with . . . statutes of limitations, due process requires that potential litigants be provided an opportunity for the

- 25 -

presentation of claims at a meaningful time and in a meaningful manner.'" Id. (quoting Burford v. State, 845 S.W.2d 204, 208 (Tenn. 1992)). Our supreme court described the three steps of the "Burford rule" as follows:

> "(1) determine when the limitations period would normally have begun to run; (2) determine whether the grounds for relief actually arose after the limitations period would normally have commenced; and (3) if the grounds are 'later-arising,' determine if, under the facts of the case, a strict application of the limitations period would effectively deny the petitioner a reasonable opportunity to present the claim."

Id. (quoting Sands v. State, 903 S.W.2d 297, 301 (Tenn. 1995)). "Whether due process considerations require tolling of a statute of limitations is a mixed question of law and fact, which we review de novo with no presumption of correctness." Harris, 301 S.W.3d at 145.

The Petitioner's petition for coram nobis relief is based on a claim of recanted testimony. Recanted testimony may be considered newly discovered evidence under certain circumstances. See Mixon, 983 S.W.2d at 672. This court has concluded that a trial court should only grant a writ of error coram nobis upon the basis of newly discovered recanted testimony if:

> (1) the trial court is reasonably well satisfied that the testimony given by the material witness was false and the new testimony is true; (2) the defendant was reasonably diligent in discovering the new evidence, or was surprised by the false testimony, or was unable to know of the falsity of the testimony until after the trial; and (3) the jury might have reached a different conclusion had the truth been told.

State v. Ratliff, 71 S.W.3d 291, 298 (Tenn. Crim. App. 2001) (citing Mixon, 983 S.W.2d at 673 n.17).

In the instant case, the trial court stated that "it has not been established that . . . Moreland testified falsely at trial and that his alleged recantation is true." The court also noted that the document was typewritten and not in Moreland's own handwriting. The court stated that although Moreland was called as a witness at the hearing, he elected not to testify. Accordingly, the court found that "there is no proof before [the trial court] that . . . Moreland recants his previous statements inculpating" the Petitioner.

Moreover, the trial court noted E.H.'s testimony that Moreland told the truth at

trial, that he never stated the Petitioner was not involved in the offense, and that Moreland changed his story only after being housed in the same facility as the Petitioner. The trial court further noted that "[t]here has been a pattern of witnesses varying testimony after having contact with [the Petitioner] or his agents."

The trial court also questioned whether the Petitioner was diligent in discovering the newly discovered evidence. The court cited Mark C. Noles v. State, No. M2009-02073-CCA-R3-PC, 2010 WL 2867180, at *4 (Tenn. Crim. App. at Nashville, July 22, 2010), finding that if Moreland's trial testimony were false, the Petitioner would have known about the falsity because he was "'present at the events' which gave rise to the testimony."

Finally, the court found that there was "no reasonable probability that the result of the proceeding would have been different." We note that the proper standard to be applied, however, is whether the jury "may have" reached a different result. This court has previously stated, "While this appears at first glance to be a matter of mere semantics, the difference in the analysis of the situation under a 'would have' standard is definitively more burdensome for a coram nobis petitioner than would be the case under a 'may have' standard." Margo Freshwater v. State, No. W2006-01758-CCA-OT-CO, 2008 WL 4560242, at *9 (Tenn. Crim. App. at Jackson, Oct. 8, 2008). Regardless, we conclude that the Petitioner is not entitled to relief.

Nevertheless, the court found that the State's case against the Petitioner was strong, stating:

> Moreland's testimony as an accomplice was corroborated by the eyewitness testimony of Trey Mosby (who testified he saw four men in the silver Chevrolet Impala) and Brian Beech (who testified as to his observations of the vehicle) as well as the phone records for the phone number [the Petitioner] had previously used as a contact number on the bill of sale for the vehicle used in the robbery, and the testimony of Ms. Watters, [the Petitioner's] girlfriend. . . . Additionally, as the State pointed out, [the Petitioner's] car was used in the commission of the offense; the police recovered robbery accouterments— masks, gloves, bandanas—in the vehicle, all of which had [the Petitioner's] DNA on them.

We conclude that the trial court did not abuse its discretion in dismissing the petition for a writ of error coram nobis.

## III. Conclusion

Finding no error, we affirm the rulings of the trial court.

_____<br>
NORMA MCGEE OGLE, JUDGE